Alexander Del Gtorno, J.
This is a claim to recover damages for personal injuries sustained by claimant as a result of the alleged negligence of the State.
Claimant testified that on September 17, 1955, at about 7:30 p.m., he was roller skating at the Jones Beach State Park Roller Skating Rink, with his youngest son. He had paid an admission fee to get on the rink and had rented the skates from the concession. After he had been skating for about half an hour, his right skate hit something on the pavement and he fell. In trying to recover his balance, he fell back on his right wrist and then hit his buttock. Looking back, he saw a tarry or gummy substance which seemed to him to be a divider between the pavement and the cement' base, protruding above the base of the pavement about a half inch, and extending a distance of about six inches in length. He felt great pain in his right wrist and noticed that the back of the hand was almost at right angles to the arm. He skated to the shack and asked the attendant to remove his skates, but was ignored. Seeing an office with an armchair in it, he went in, fell into the chair and become unconscious. When he came to, his wife and eldest son, who had been in the stand while he was skating, were present with a nurse from the first-aid room and an attendant with a wheel chair. He was taken to the first-aid room, where the nurse gave him an injection and placed a triangular bandage on his hand. He was then put, while still in the wheel chair, in a pickup truck, and driven to where his car was parked, and his son took him to the Meadowbrook Hospital, where X rays of his wrist were taken. He remained there for two hours and then returned to his Summer home in Seaford. The following morning, he went to New York Hospital on East 68th Street, New York City. There more X rays were taken and his arm was set in a solid plaster of Paris cast extending from the first point of the finger to the armpit. This was kept on for two and one-half weeks. He visited this hospital 10 or 11 times, where further X rays were taken from time to time and where adjustments to the cast were made. The large cast was removed at one time and a smaller one was put on, which was kept on for another two and one-half weeks, and this process was repeated later, which cast was on for 10 days until finally a bandage was put on for two months. His last visit was about December 29, 1955.
Claimant, who is a post-office clerk, returned to light duty on his job on October 10, 1955, at which time he had a half cast on his arm. From the date of the accident to that date, he had received accumulated sick leave.
*77 For one month after the accident, the pain in the right wrist was intense and then lessened for another month, although he suffered some pain for two months thereafter, at which time it subsided somewhat. The pain has recurred occasionally, even to the present time. He requested and received lighter duty at his place of employment.
On cross-examination, the claimant stated that the reason he did not receive further treatment at Meadowbrook was because he did not want to remain there overnight.
He had skated in the Jones Beach Rink before and had seen black lines in between slabs of concrete. He clarified the use of the words “ foreign matter ” on the floor of the rink by stating that he meant tar. In his examination before trial claimant had said that he did not know it was tar that he hit, but that “ there, are separations in the cement which I judge to be tar because it was a black substance ’ ’; that he saw this tar every time he went to the rink. In the examination, he made no mention of the height or the length of the tar.
Claimant had been skating with his son, then 14 years of age, keeping him in the protected area for about five minutes and then going into the main area. The boy was learning to skate, the claimant was a good skater. Claimant was skating five feet away from his son at the time of the accident, in a parallel position. The general area of the scene is shown in State’s Exhibit “ A the “ X ” marking indicating where claimant’s wife and older son were sitting and the “ B ” marking indicating the point where claimant fell. Just prior to the occurrence, he had been holding his son by the arm.
On redirect, he testified that the cement apron of the rink is about 30 feet wide and that there were many people skating at the time.
On behalf of the claimant, Dr. Justin A. Rubin testified that he examined claimant on September 23, 1960, for the purpose of testifying on the trial. Bending claimant’s wrist up, he has a range of motion of 30 degrees out of a possible full range of 60 degrees, and bending the wrist down, he has a range of motion of 10 degrees out of a possible 70 degrees; on radial deviation, toward the thumb, he has no range of motion out of a possible 20 degrees; in ulnar deviation, toward the little finger, he has a range of motion of 20 degrees out of a possible 30 degrees. On the basis of his examination and the X ray and record, he stated that there are several fractures of the distal end of the radius and one small fracture of the styloid process of the ulna. The fracture line of the radius goes right into the *78 wrist joint and one of the large fragments is placed posteriorly; there is a large amount of displacement of the other segments. Any fracture going into the joint, involving the joint itself, would necessarily heal with scar tissue and adhesions and limit the motion of the joint and produce pain. The injury is permanent and affects the entire right arm. Converting the angles for restriction of motion into percentage of disability of the entire arm, he has, for bending the wrist up, a 5% loss of function of the entire arm; for palmar flexion, a 10% loss; in radial deviation, a 4% loss and in ulnar deviation, a 2% loss. The entire disability is 21% loss of the use of his entire arm. The fall here caused the injury. No further improvement can be contemplated, and claimant will suffer pain at times for the rest of his life, depending on the severity of his effort and weather conditions.
On cross-examination, he testified that a joint is the apposition of two surfaces, each surface of which is attached to a bone. The surface itself is cartilage. Cartilage covers the ends of bone, and can fracture.
At the close of claimant’s case, the State moved for dismissal for failure to make out a prima facie case based on negligence, on which motion decision was reserved.
On behalf of the State, Thomas R. Tinston testified that on the date of the accident, he was on duty at the rink as an attendant. His duty was to inspect the rink, and in performing this duty, he walked in a clockwise motion around the rink to see that everything was in good condition. He looked for hairpins, facial tissues or any substance that might be on the rink, and if he found anything, removed it. He did not see the accident but was informed by some young boy that someone had met with an accident. He contacted the foreman, Mr. Ducker, now in California, who took a statement from the boy. In the meantime, the man who was hurt had been removed to the first-aid station by another attendant. He went immediately to the spot where the boy had told him the accident happened. He spent five minutes inspecting the immediate vicinity and found nothing. He did see the usual black lines and filler. The black line which fills the crack is about three inches wide. He testified that about 10 or 15 minutes prior to this time, he had warned claimant about going too fast. He had seen claimant in the skate house and was positive that he was the man he had warned previously, although at the trial he could not identify him positively. After he had warned claimant, the witness informed Mr. Ducker and asked him to call a policeman. Ducker came out to the rink, looked at claimant and then went back to his *79 room. A policeman did not appear. On the night of the accident, there were about 50 or 60 people skating.
On cross-examination, the witness stated that on that night he had no occasion to warn any skater about going too fast other than claimant. He then stated that claimant was the same man he warned and that when he saw him, claimant was skating 1 ‘ like a fourteen year old child” by himself. While on his inspection tour, the skaters proceed counterclockwise in the opposite direction from his own. He had never observed the filler between the concrete slabs to be higher than the surface, in his 10 years of duty, nor did he ever know anyone to have been injured by a fall caused by the dividers between the concrete slabs. When he saw claimant in the skate house within five minutes, an attendant called him over to show him the claimant who was seated on a bench and was conscious. Nobody was with him at that time, except the attendant. A written report of the accident was filed, signed by the witness, by Mr. Ducker and others, and was filled in, according to the witness, by Mr. Ducker. The report stated that ‘1 patron Lyons was warned by Mr. Tinston and Mr. Ducker for skating too fast ”, although the witness had no recollection of Ducker’s warning claimant. The report stated also that the rink was examined and found to be in good condition, and gave the name of the witness, one Bandy Ferry. The witness stated that on the trial he did not recognize claimant as the man he warned, but on redirect testified that since 1955 he has observed more than 100,000 people at the rink. In response to a query by the court, he stated that although he found nothing abnormal at the time he inspected the rink, he was unaware of what claimant contended had caused his fall.
A New York City weather report admitted in evidence indicated that the temperatures on the date of the accident were as follows: 10:00 a.m., 69 degrees; 11:00 a.m., 70 degrees; 12:00 noon, 73 degrees; 1:00 p.m., 74 degrees; 2:00 p.m., 74 degrees; 3:00 p.m., 74 degrees; 4:00 p.m., 75 degrees; 5:00 p.m., 73 degrees; 6:00 p.m., 71 degrees and 7:00 p.m., 68 degrees. The court will take judicial notice of the fact that the temperature at Jones Beach is generally 5 degrees cooler.
The records of the New York Hospital, so far as they relate to this accident were also admitted into evidence.
It was agreed between the parties that the total sum expended by claimant for hospital and medical expenses was $185.90.
On behalf of the State, Mr. Bichard Ferry, an instructor at Ithaca College, testified that he was present with a lady friend at the rink at the time of the accident. Befreshing his recollec *80 tiun from a written statement lie made at the time, he slated that, seeing a gentleman ahead of him had fallen, he went to him to see if he needed help. The man said he thought he had broken his wrist, but needed no help. The man then skated away fast toward the skate house. On cross-examination, he testified that while he probably passed over several times the spot where claimant had fallen, he made no observation of the pavement.
The State then rested.
Called in rebuttal on behalf of the claimant, Mrs.'Betty Lyons, his wife, testified that on the evening of the accident, she had been in the stand about a half-hour before her husband fell. She and her older son were watching her husband and younger son skating. Her husband, teaching the boy to skate, was going slow. On cross-examination, she testified that she did not see her husband fall, and that at the time of the fall she could not say how fast he was skating.
The State renewed its.prior motion, and moved for dismissal upon the ground that claimant failed to preponderate.
The State as the proprietor of the roller skating rink, is required to use reasonable care in maintaining the rink and the premises generally in such condition as to protect its patrons from injury. Its duty is to guard actively against risk which reasonably might be anticipated. (Levy v. Jacobs, 131 Misc. 824.) Although the patron of a skating rink assumes to a certain extent the risk of injury, nevertheless he assumes only those risks reasonably to be anticipated. If such risks are increased by the negligence of the proprietor, liability may result.
Proceeding to- the question as to whether the State was guilty of negligence, the court must determine if there was any defect in the surface of the rink upon which claimant was skating. The only testimony as to the actual cause of the accident was that of the claimant himself, who stated that as he was falling he looked back and saAv a tarry substance, a divider between the pavement and the cement base, protruding a half inch above the base and extending a distance of about six inches in length. As to the existence of such protuberance there is no corroboration whatever of claimant’s testimony, either by oral or visual evidence.
The State’s Avitness Tinston testified • that he inspected the scene immediately after the occurrence and found nothing unusual. All he did see at that time was the usual black lines and filler, the black line filling the crack being about three inches Avide. He testified further that about 10 or 15 minutes prior to *81 tho accident, he had warned claimant about skating too fast, which claimant denies.
Considering independently the evidence introduced as to the temperature on the day of the accident, and allowing for the 5 degree difference heretofore noted, the temperature ranged from 64 degrees at 10:00 a.m. to a high of 70 degrees at 4:00 p.m. and down to 63 degrees at 7:00 p.m. It is the opinion of the court that such temperatures could not have been of sufficient heat intensity to cause the asphalt or the tar to raise above its normal position.
The testimony of other witnesses on behalf of claimant and the State does not in any way change the basic issue here, and the issue, as to the existence of the alleged projection is one of credibility as between claimant and State’s witness Tinston, considered in the light of all surrounding circumstances.
The same situation exists with respect to the question of whether claimant had been warned about skating too fast prior to the occurrence of the accident, except that the court must consider the written report filed as bearing upon the question.
On the evidence presented, the court is constrained to hold that claimant has failed to establish the negligence of the State by a fair preponderance of the evidence adduced. No improper construction or maintenance of the rink was proved, nor was the evidence sufficient to show that there was a projection above the base of the rink causing the claimant to fall. In addition, the accident was not reasonably foreseeable. (Levy v. Boardwalk Skating Rink, 272 App. Div. 910, affd. 297 N. Y. 878.)
The court finds further that claimant failed to establish notice to the State, either actual or constructive, of the existence of the alleged defect in the rink. (Idel v. Mitchell, 158 N. Y. 134; Bottalico v. City of New York, 281 App. Div. 339.)
The motion heretofore made by the State to dismiss on the ground that claimant has not established his claim by a preponderance of the evidence, on which decision was reserved, is hereby granted. The claim is dismissed.